# IN THE COURT OF APPEALS OF IOWA

No. 16-1761
Filed December 21, 2016

**IN THE INTEREST OF C.C.,**
**Minor child,**

**B.C., Mother,**
    Appellant.
_____

Appeal from the Iowa District Court for Marshall County, Paul G. Crawford, District Associate Judge.

A mother appeals the court's permanency order that directed the establishment of a guardianship for the child with the paternal grandmother. **AFFIRMED.**

Laura A. Eilers of Peglow, O'Hare & See, Marshalltown, for appellant mother.

Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney General, for appellee State.

Mary Cowdrey of Public Defender's Office, Marshalltown, guardian ad litem for minor child.

Considered by Vogel, P.J., and Tabor and Mullins, JJ.

**VOGEL, Presiding Judge.**

The mother appeals the juvenile court's determination that the child at issue could not be returned to her care at the present time but that there should instead be the establishment of a guardianship with the paternal grandmother. She claims the department of human services (DHS) did not make reasonable efforts to reunify her with her child. She also claims the court was incorrect to conclude that it was contrary to the welfare of the child to be returned to her care. Finally, she asserts it was not in the child's best interests to have the permanency goal modified to establish a guardianship with the paternal grandmother. Because we conclude reasonable efforts toward reunification were made and it was in the child's best interests to establish a guardianship to provide the child security in his placement, we affirm the district court's permanency order.

The child was born in March 2008, and the father and mother divorced in the same year. Following the divorce, the child remained in the father's care, and the mother's visitation with the child was sporadic. In January 2015, the child was removed from the father's care following allegations of physical abuse at the hands of the child's father. The child was adjudicated a child in need of assistance (CINA) and was placed with his paternal grandmother at that time; he remains in her care.

Following a November 2015 permanency hearing, the mother was given an additional six months to work toward reunification, but the court outlined its expectations that during those six months the mother: "continue to cooperate with [Family Safety, Risk, and Permanency] services," "obtain suitable and safe

housing," "comply with recommended mental health and medication management services," and "provide income security for [herself] and the child." The court noted its list was not exhaustive of the services or goals to be satisfied for the mother to parent the child safely.

A family team meeting was held on February 4, 2016, in order to "progress [the mother's] visits with [the child]." At the meeting, the mother was informed that she was not to tell the child that he was going to come live with her because it caused the child "a lot of anxiety." In addition, the mother was instructed that visitations needed to occur in the Marshalltown area. However, during the first visitation following this meeting, after being informed the child was not feeling well, the mother took the child to her home in Williamsburg, more than one hour outside the Marshalltown area, kept him several hours longer than the DHS had approved, and returned the child to the paternal grandmother with a fever of more than 103 degrees. The grandmother noted the child started to immediately cry when he was returned to her home, complaining he was sick. The child was diagnosed with influenza, and the mother's visitations were reduced to every other weekend for four hours.

The grandmother testified the child began sleeping in her room following the visit to Williamsburg because the child was afraid the mother would come in the middle of the night and take him. The grandmother reported the child's grades dropped following the Williamsburg visit, and the child began acting out aggressively at school as well. The grandmother stated the mother did not call the child on his birthday, though she did attend a birthday party for the child the weekend before; she was not present for, nor did she call prior to or after, the

child's surgery to remove his tonsils and adenoids; and she has never attended any of the child's medical, school, or therapy appointments.

In April 2016, the child's guardian ad litem filed a report that indicated the child wished to remain at the grandmother's house and was "worr[ied] that my mom will get me; that I will live with her. I don't want to." The child did report, "I would like to visit my mom and dad. I would like to stay with grandma. I would like longer visits with dad and mom."

At the May 2016 permanency hearing, the DHS worker testified:

> [The child] has some very specific needs based on his mental health issues. He has ADHD, and he also has got pervasive developmental disorder. That's not been—I mean, it's not specified. He needs stability and structure. He needs to have consistency.
>
> It's important for [the child] to know what is going to happen in his day, and there needs to be—he functions much better when there is consistency and predictability to his day. He tends to struggle when there's transitions that occur that are not scheduled. And he has been offered that in his current home. [The mother] has been somewhat sporadic in her visits.
>
> Though I understand that, you know, some of that has to do with transportation and other issues, but even when things are within her control, there are times that she's late for visits, late getting him back from visits. There's no consistency, you know, with phone calls, and—so my concern is about [the child's] ability to be in a good place with his mom.

She further testified,

> [The child] ha[s] a fear of going to live with his mom. He expressed that he did not want to go and live with his mom. At the time he didn't even want to go and do overnight visits. We were trying to work up to that, and that was explained to [the mother] during the family team meeting. Specifically requested that she not talk to him about coming to overnight visits, or that he was going to come and live with her because it caused him anxiety.

However, the DHS worker acknowledged that the mother did obtain stable employment and the mother's home was clean, well maintained, and appropriate for the child.

The mother testified that her work in Williamsburg had thus far impeded her ability to attend the child's appointments and events at school, his therapy appointments, and even her ability to call the child on his birthday. She further testified that if the child was placed in her care, her employer would be more accommodating to allow her to take time off to attend to his needs. She claimed the child never appeared anxious or ill during the Williamsburg visit, and she regularly checked him for signs of a fever during the visit because she had been alerted by the grandmother that he might have a cold. She stated she had lined up medical and therapy providers in the Williamsburg area that could tend to the child's needs and had determined which school the child would attend.

The court issued its permanency order in October 2016, denying the mother's request the child be placed in her care and modifying the permanency plan for the establishment of a guardianship for the child with the paternal grandmother. The court concluded:

> Overall, the best interest of the child calls for the permanency order to be modified. [The child] deserves to have the consistency, stability, and safety which can be offered by a guardianship with his grandparents. They have demonstrated these traits while serving as [the child's] foster parents. [The mother] should be commended for her efforts to stabilize her situation. However, she has more work to do. [The child] should not have to wait. A guardianship will still allow [the child's] parents to visit him and be a part of his life to the extent he desires. If, in the future, his parents feel they have sufficiently progressed, then they can ask the district court to dissolve the guardianship.
> . . . .

The Court finds that the Department of Human Services has made reasonable efforts to reunify the family since the removal, as documented by the written reports and the case permanency plan. The Court further finds that no party has requested additional services or assistance. However, the Court finds that it is still contrary to the welfare of the child to be returned home because the child would still be without proper care and supervision.

Our review of permanency orders in a CINA proceeding is de novo. *In re K.C.*, 660 N.W.2d 29, 32 (Iowa 2003). We give weight to the factual findings of the district court, but we are not bound by them. *Id.* The best interest of the child is our paramount concern. *Id.*

The mother first claims that the DHS did not make reasonable efforts to reunify her and the child. Yet neither at the district court nor on appeal does the mother indicate what services the DHS failed to offer. *In re L.M.W.*, 518 N.W.2d 804, 807 (Iowa Ct. App. 1994) ("[P]arents have a responsibility to demand services."). The mother criticizes the location restrictions placed on her for her visitation with the child. But it is clear from the testimony the restrictions were implemented in light of the child's anxiety and reaction following visits with the mother that took him out of the location and made him believe his placement was unstable.[1] The mother also faults the DHS for not setting up joint therapy sessions that the parenting assessment noted would be beneficial. However, the record is clear the mother was told to contact the child's therapist to set up joint sessions. The mother attempted to attend one therapy session, but she failed to attend when she was unexpectedly asked to work a double shift that day. She

---

[1] We draw no negative inference from the fact that the child became ill following the Williamsburg visitation.

made no further efforts to attend any other therapy appointments with the child. We conclude the DHS made reasonable efforts toward reunification.

The mother's next two issues both address whether the establishment of the guardianship was in the child's best interests. The mother claims she achieved all that was required of her in the November 2015 permanency order: stable housing, employment, and mental health treatment and medication management. She contends the child has been known to be manipulative and that his insecurities result from the DHS refusing to allow her to discuss with the child the idea of the child living with her.

We agree with the juvenile court's assessment that the establishment of the guardianship is in the child's best interests. The child has specific, special needs requiring stability and consistency. His needs are being met in the grandmother's care, and he is thriving. The child has expressed anxiety and fear over living with the mother, but he has also expressed a desire to continue to have visitation, even extended visitation, with her. The grandmother testified she is willing to continue to provide the mother with visitation if the guardianship is established and would only limit contact if the child was being hurt. The guardianship accomplishes both the child's need for stability and permanence and the child's desire for continuing contact with the mother. In addition, as the juvenile court noted, "If, in the future, his parents feel they have sufficiently progressed, then they can ask the district court to dissolve the guardianship."

We affirm the juvenile court's permanency order.

**AFFIRMED.**